399 A.2d 479.

J.W.A. Realty, Inc. *et al. vs.* City of Cranston.

MARCH 21, 1979.

Present: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

Doris, J.   This is a petition for assessment of damages resulting from the condemnation by the city of Cranson of a certain parcel of land owned by the petitioners[1] on Aqueduct Road in said city. The petition is brought pursuant to G.L. 1956 (1968 Reenactment) §§24-1-1 to 11 and P.L. 1967, ch. 140. The case was heard by a Superior Court justice sitting without a jury who assessed damages at $240,000, plus interest according to law; and judgment in accordance with that assessment was subsequently entered. The respondent has appealed, claiming that the award is excessive.

The petitioners' land was condemned by the city of Cranston, exercising its power of eminent domain, on July 27, 1971. The evidence adduced at trial was in the main uncontradicted. The record indicates that in early 1968, title to the land in question was held by J.W.A. Realty, Inc., a corporation owned and controlled by William Artesani. The land was situated in an area zoned "B-2" multi-family residential. Artesani approached Franklin W. Simon, a successful real estate developer, concerning the possibility of the latter purchasing the land for $150,000. Simon, after viewing the land and being favorably impressed, retained an architect and began preliminary discussions with the Federal Housing Administration (FHA) for sponsorship of a housing development. Artesani and Simon entered into an agreement which provided that the land would be sold for $84,000 to a partnership in which Artesani and Simon would be equal partners. The partnership would develop the land for apartment purposes for the mutual benefit of Artesani and Simon. Under the agreement Artesani was to be responsible for all of the preconstruction expenses while Simon would do the necessary work. This transaction, however, was never fully consummated.

---

[1] J.W.A. Realty, Inc., and Robhar, Inc., both brought the original petition. During the trial Franklin W. Simon, William Artesani, and Jeanette Artesani were added as petitioners.

Substantial work to develop 108 apartment units on the land was performed by Simon and the engineers, architects, and surveyors that he hired. In August 1969, a formal application for feasibility was submitted to the FHA under the provisions of section 221(d)(2)(4) of the National Housing Act. This application was rejected. In July 1970, a revised application under section 236 of the Act was submitted, and the following month a feasibility commitment was granted by the FHA. Expenses for legal and accounting work were incurred, and funds for the project were formally reserved by the FHA. New England Merchants National Bank agreed to furnish construction financing.

During the interim, because of the delay, effort, and expense involved, Artesani had a change of heart and attempted to annul the partnership by means of litigation against Simon. The litigation was settled by an agreement under the terms of which J.W.A. Realty would liquidate and convey the property to Artesani and his wife Jeanette, who in turn would sell the property to Robhar, Inc. (a corporation owned and controlled by Simon) for $91,500.[2] Additionally, Simon would incur all of the expenses connected with the project and would grant a general release of his claim for money damages.

In the meantime Simon remained hard at work on the project. An application for conditional commitment was filed with the FHA and the conditional commitment, providing for a mortgage on the project in excess of $2,000,000, was granted on March 5, 1971. Further test borings were conducted, a general contractor was retained, bids went out to subcontractors, and site preparation commenced. Final working papers, finished plans, and complete specifications were prepared. The FHA conditional commitment and the federal government's reservation of both contract funds and

---

[2] At the time of the condemnation the Artesanis were in possession of a warranty deed running from J.W.A. Realty to themselves. This deed was not recorded.

rent subsidy funds were extended through October 1971. An application for a firm FHA commitment was filed in April 1971. In August 1971, when petitioners applied to the city for a building permit, they discovered for the first time that the land had been taken by condemnation on July 27, 1971. Because of the condemnation the allocation of funds was subsequently canceled by the FHA.

At trial on the question of compensation due petitioners, Simon testified that conditional commitment is tantamount to final commitment and was salable for an amount between $4,000 and $5,000 per unit. He stated that but for the condemnation the development would have begun in the fall of 1971. He further testified that the expenses incurred to prepare the development exceeded $100,000.[3]

Herbert Y. Mason, a duly qualfied real estate expert testifying for petitioners, stated that the underlying[4] value of the land on the date of condemnation was $168,000 based on 112 units at $1,500 per unit. He stated that this figure was arrived at by employing an "income approach," based, however, on five comparable properties. Mr. Mason then testified that Simon's developmental work had substantially increased the property's value over and above the underlying value, but he was unable to state a specific figure.

Martin J. Coleman, a duly qualified real estate expert called by petitioners, testified that the fair market value of the property was $240,000, of which $170,000 represented the underlying value of the land and $70,000 represented the value that the land was enhanced as a result of the efforts of Artesani and Simon. Coleman stated that this "enhancement

---

[3]He broke this figure down into the following components: Legal fees — $8,000; Architects — $60,000; Soil engineering — $2,500; Surveys — $1,000; Accounting — $25,000; Site planning — $12,000; FHA Filing fees — $6,230; Blueprints — $1,500; and Site work — $2,500.

[4]"Underlying value" had previously been defined by counsel as the value of the land itself without considering any of the various developmental types of work done on the property.

value" was something above and beyond the basic value of the land itself.

Walter A. DePrete, a duly qualified Cranston real estate appraiser, testified for respondent. He stated that using the comparable sales method of valuation, but employing different properties from those used by Mason and Coleman in their appraisals, he valued the property at $82,000, based upon 114 units at $720 each. He then stated that considering the effect of the Freshwater Wetlands Act on the property he reduced the value by 10% and arrived at a final value of $74,000.

The trial justice found that conditional commitment by the FHA is tantamount to near consummation of the transaction; that conditional commitments are salable; and that except for the condemnation, construction of a large and potentially profitable apartment development would have commenced in the fall of 1971. These findings are entitled to great weight and will not be disturbed unless the trial justice has misconceived or overlooked material evidence or is clearly wrong. *See Caldarone* v. *State,* 98 R.I. 7, 13, 199 A.2d 303, 306-07 (1964). Furthermore, the trial justice accepted the testimony of Mr. Mason that the borings, design plans, surveying, financial arrangements, and the other site preparation work rendered the property unique and not subject to the comparable sales approach *except* in regard to its underlying value. Accordingly, he awarded petitioners $240,000, specifically stating that $170,000 represented the underlying value and $70,000 the enhanced value.

The respondent contends that the trial justice erred by admitting testimony concerning the fair market value of the property that relied upon factors other than the comparable sales method. The respondent asserts that just compensation for property taken by eminent domain is its fair market value as evidenced by prices paid at or about the time of the taking for substantially similar and comparable properties at voluntary sales in the open market. *See Manning* v. *Redevelopment Agency,* 103 R.I. 371, 374, 238 A.2d 378,

380 (1968). The respondent places particular emphasis upon our statement in *Lataille* v. *Housing Authority*, 109 R.I. 75, 79, 280 A.2d 98, 100 (1971), that the availability of evidence of comparable sales of similar lands operates to exclude from evidence testimony based upon other methods for determining fair market value. The ruling of the trial justice, admitting evidence based upon the enhancement value method as an aid in determining fair market value, is the primary basis of respondent's appeal.

In this jurisdiction the measure of the constitutionally required "just compensation" due a property owner whose land has been taken by eminent domain is the fair market value of the property. One authority has noted that:

> "By 'fair market value' is meant the amount of money which a purchaser willing but not obliged to buy the property would pay to an owner willing but not obliged to sell it, taking into consideration all uses for which the land was suited and might in reason be applied." 4 Nichols, *The Law of Eminent Domain* §12.2[1], at 12-71 to 81 (rev. 3d ed. Sackman 1978).

It is equally well settled that prices paid in the open market at or about the time of the taking for substantially similar and comparable properties, when available and when proper adjustments can be made for minor differences between the properties, are the best evidence of the fair market value of the property. *Thomas B. Gray, Inc.* v. *Providence Redevelopment Agency*, 114 R.I. 370, 373, 333 A.2d 143, 145 (1975); *Manning* v. *Redevelopment Agency*, 103 R.I. at 374, 238 A.2d at 380. Except in unusual cases involving peculiar circumstances, the availability of that kind of evidence precludes evidence of fair market value computed by other methods. *See Lataille* v. *Housing Authority*, 109 R.I. at 79-80, 280 A.2d at 100. This general rule, rather than depending upon any fundamental principle of the law of evidence, is designed to expedite the orderly administration of

justice in eminent domain proceedings. *See* 4 Nichols, §12.311[3], at 12-158 to 159.

While the preferred method of determining the fair market value is the comparable sales approach, it is within the discretion of the trial justice to depart from this method when he finds that unusual circumstances exist or that the condemned property is unique or suited for a special purpose. *See O'Donnell* v. *State*, 117 R.I. 660, 665, 370 A.2d 233, 236 (1977); *Corrado* v. *Providence Redevelopment Agency*, 117 R.I. 647, 655, 370 A.2d 226, 230-31 (1977); *noted* in 12 *Suffolk U.L. Rev.* 644 (1978); *Thomas B. Gray, Inc.* v. *Providence Redevelopment Agency*, 114 R.I. at 373, 333 A.2d at 145; *Lataille* v. *Housing Authority*, 109 R.I. at 79-80, 280 A.2d at 100. This finding is entitled to great weight and will be reversed only if the trial justice was "palpably or grossly wrong." *O'Donnell* v. *State*, 117 R.I. at 665, 370 A.2d at 236; *Hervey* v. *City of Providence*, 47 R.I. 378, 380, 133 A. 618, 619 (1926). This policy reflects the fundamental proposition that just compensation is the court's ultimate objective. A departure from the general rule is required when the admission of other more relevant methods of ascertaining fair market value will avoid injustices to the owner of the condemned property. *See Corrado* v. *Providence Redevelopment Agency*, 117 R.I. at 657, 370 A.2d at 231.

The respondent argues that comparable sales existed and bolsters its argument by noting that both Mr. Mason and Mr. Coleman employed comparable sales to arrive at their appraisals. The petitioners, however, point out that the comparable sales were utilized only to arrive at the appraised underlying value of the land and that this testimony was accepted by the trial justice as a basis of his decision. The trial justice indeed found that the comparable sales related only to the underlying value of the land, and, this finding therefore made consideration of other evidence relating to fair market value necessary. The respondent has failed to convince us that this finding was palpably or grossly wrong.

The theory of enhancement value used by petitioners and relied upon by the trial justice in this case has been accepted as a basis for determining fair market value in several other jurisdictions. In *United States v. 25.406 Acres of Land*, 172 F.2d 990 (4th Cir.), *cert. denied*, 337 U.S. 931 (1949), there was evidence that the best use to which the condemned land could be put was the construction of a multistory apartment building. Similar to the instant case, the development had been carefully planned and would have been effectuated but for the condemnation. The petitioner was permitted to testify concerning the site planning, construction contracts, and financial arrangements that had occurred prior to the condemnation. *Id.* at 993. The court observed that this evidence was relevant to the determination of market value because it involved factors that would certainly be considered by any prudent prospective buyer.

Several state courts have faced factual situations nearly identical to the one presently before us. In *State v. Chang*, 50 Haw. 195, 436 P.2d 3 (1967), evidence of comparable sales was available. Nevertheless, the court permitted into evidence testimony relating to the petitioner's expenditures

---

[5]The trial transcript and decision of the trial justice reflect a terminological confusion concerning the theory of valuation actually relied upon by the petitioners. One noted authority has stated that the general rule is that any "enhancement in value" which is brought about in anticipation and by reason of the projected public use to which the property will be put after the condemnation is excluded in determining the fair market value of the land. 4 Nichols §12.315, at 12-415. This rule applies in Rhode Island. *See Rhode Island Hosp. Trust Co. v. Providence County Court House Comm'n*, 52 R.I. 186, 189, 159 A. 642, 643 (1932). Accordingly, the respondent is correct in its assertion that the trial justice erroneously relied upon the case of *In re State House Comm'rs*, 19 R.I. 382 (1896), because that case also concerned enhancement in value accruing because of the proposed public improvement. This error, however, was nothing more than a semantic inaccuracy that had no effect upon the decision below. The trial justice was quite clear as to the basis of his decision admitting the testimony in question when he defined "enhancement value" as the "incremental value accruing to the land by reason of the fact that these valuable 'improvements' had in fact been carried out prior to the fall of the municipal ax." The "improvements" referred to resulted from the preliminary work conducted by Artesani and Simon.

for architect, engineer, and attorney fees and mortgage finance negotiations in preparing the land for use as a professional office building. *Id.* at 198, 436, P.2d at 5. Similar to the present case, *Chang* was *not* a situation in which the jury separately determined fair market value and then added on preliminary development expenditures. Rather, the developer's efforts were considered as having enhanced the value of the property. Likewise, in *State* v. *Willett Holding Co.,* 62 N.J. 59, 298 A.2d 69 (1972), the defendant was permitted to introduce evidence as to his expenses for completed financial arrangements, which included FHA approval and guarantees concerning the proposed construction and permanent mortgages. The New Jersey court indicated that the courts have almost always admitted into evidence the actual cost of making financial arrangements. *Id.* at 61, 298 A.2d at 71. Other judicial decisions support the view that expenditures for planning, engineering, architectural and legal fees, financial arrangements, and other site preparation should be reflected in the market value of the land as an increment added to the property's value. *See, e.g. Rivers* v. *State,* 275 So.2d 551 (Fla. Dist. Ct. App. 1973); *Banner Milling Co.* v. *State,* 240 N.Y. 533, 148 N.E. 668 (1925); *Specialty Foods Corp* v. *State,* 46 App. Div. 2d 989, 362 N.Y.S.2d 266 (Sup. Ct. 1074); 4 Nichols, §12.3142[1][a], at 12-362. *But see City of Chicago* v. *Provus,* 415 Ill. 618, 114 N.E.2d 793 (1953).

Accordingly, we hold that the trial justice in this case committed no error when he admitted the testimony concerning the preliminary expenditures. The question whether these expenditures so enhanced the fair market value of the property that it was impossible to rely on the available comparable sales as the sole method of valuation was a matter resting in the sound discretion of the trial justice. We perceive nothing to indicate that the trial justice abused his discretion. In awarding petitioners $240,000, the trial justice did not simply add the costs of the preliminary work to the underlying value; rather, the resultant enhancement was viewed as an essential component of the market value itself.

Furthermore, we find the present case markedly similar to the situation this court confronted in *Hall* v. *City of Providence*, 45 R.I. 167, 121 A. 66 (1923). In *Hall*, a highly improved farm was located on the condemned property. Because there were no comparably improved properties in the area, this court held that the trial justice was warranted in permitting the petitioner to submit evidence of the amount he expended to place the property in the condition in which it was at the time of the condemnation. *Id.* at 168-69, 121 A. at 67. Likewise, in the instant case there were no comparable sales that reflected the special characteristics of the property resulting from the work of Simon and Artesani, and therefore the evidence concerning enhanced value was admissible.

The respondent raises two further issues on appeal. Section 24-1-8 permits "Any owner of, or person entitled to any estate or right in, or interested in any part of the real property so taken" to petition in the Superior Court for an assessment of damages. The respondent, pointing to the parties' stipulation that J.W.A. Realty was the record owner of the property at the time of the taking, argues that the trial justice committed error when he, (1) granted judgment in favor of any party other than J.W.A. Realty, (2) admitted the Artesanis and Simon as petitioners during the course of the trial, and (3) refused to grant respondent's motion to dismiss as to Robhar, Inc. The error, if any, was certainly not prejudicial to respondent and does not require reversal. Both sides agree that J.W.A. Realty was a proper petitioner. The issues argued at trial were the same regardless of the true rightful owner.

Finally, the respondent argues that the trial justice's decision did not comply with Super. R. Civ. P. 52(a). As we stated in *Rowell* v. *Kaplan*, 103 R.I. 60, 70-71, 235 A.2d 91, 97-98 (1967), in order to comply with this rule the trial justice need not engage in extensive analysis and discussion. Even brief findings and conclusions are sufficient as long as they address and resolve the pertinent, controlling factual and legal issues. *See Shoor-Elias Glass Co.* v. *Raymond Construction Co.*, 114 R.I. 714, 716, 339 A.2d 250, 252 (1975);

*Spangler* v. *Schaus*, 106 R.I. 795, 807-08, 264 A.2d 161, 168 (1970). Our reading of the trial justice's opinion in this case leaves no doubt that he surpassed the minimum required by *Rowell*.

The respondent's appeal is denied and dismissed, the judgment appealed from is affirmed and the case is remanded to the Superior Court for further proceedings.

*Selya and Iannuccillo, Bruce M. Selya, Robert A. Goldberg, Charleson & Brill, Frederic A. Charleson,* for petitioners.

*Strauss, Factor, Chernick & Hillman, P.C., William C. Hillman,* for respondent.